# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Cleveland*, 2012 IL App (1st) 101631

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALBERT CLEVELAND, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-1631 |
| Filed | November 30, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The dismissal of defendant's claims of ineffective assistance of counsel in his *pro se* postconviction petition that his appointed counsel had a *per se* conflict of interest based on his prior representation of defendant's victim and that he failed to call exculpatory witnesses was reversed and the cause was remanded for a third-stage evidentiary hearing. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 95-CR-26313; the Hon. Charles P. Burns, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Rachel Moran, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Amy Watroba Kern, John Nowak, and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | JUSTICE GARCIA delivered the judgment of the court, with opinion. Justices Hall and Gordon concurred in the judgment and opinion. |

**OPINION**

¶ 1    The trial court dismissed defendant Albert Cleveland's petition at the second stage of postconviction proceedings. In 1996, the defendant was convicted of murder and attempted murder. In 1998, the defendant filed a *pro se* postconviction petition alleging ineffective assistance of trial counsel based on a *per se* conflict of interest and counsel's failure to call the mother of his children as an alibi witness. Over the course of 10 years, appointed counsel supplemented the defendant's initial petition with additional affidavits from other potential exculpatory witnesses and added another claim of ineffective assistance of counsel alleging he was precluded from testifying by his defense counsel. In assessing the merits of the petition, the trial judge refused to consider the failure-to-testify claim and some of the supplemental affidavits as untimely. Based on the remaining material, the court ruled the petition failed to show a substantial deprivation of a constitutional right. The court rejected the defendant's claim of a *per se* conflict of interest because defense counsel's prior representation of the murder victim occurred years before the defendant's trial. The court concluded the defendant suffered no prejudice based on the alleged conflict. The court also rejected the affidavits from the remaining witnesses as not supporting an alibi defense. Finally, the court ruled no substantial showing was made that defense counsel precluded the defendant from testifying. We reverse as to the first two claims. The Illinois Supreme Court has made it clear that a *per se* conflict of interest grounded on defense counsel's representation of both the defendant and the victim of the defendant's criminal conduct is not subject to a prejudice analysis. In the context of a postconviction petition, a supported claim that defense counsel was subject to a *per se* conflict of interest makes a substantial showing of a violation of the defendant's sixth amendment right. We rule the court erred in striking affidavits of potential alibi witnesses from the record. We conclude the defendant has made a substantial showing of a constitutional violation based on counsel's failure to interview several alibi witnesses. We affirm the dismissal of the defendant's final claim based on counsel's alleged refusal to allow him to testify because the defendant did not assert his desire to testify before the trial court. We remand for a third-stage evidentiary hearing on the

claims that his counsel was subject to a *per se* conflict of interest and that defense counsel failed to call known exculpatory witnesses.

¶ 2                                      BACKGROUND

¶ 3       The defendant was convicted by a jury of first degree murder and of attempted murder on September 27, 1996. In his direct appeal, the defendant raised three claims: (1) lack of proof beyond a reasonable doubt; (2) improper comments by the prosecutor during closing argument; and (3) defense counsel's ineffectiveness for failing to object to the improper comments. On December 31, 1997, this court affirmed in an unpublished decision. *People v. Cleveland*, No. 1-96-4327 (1997) (unpublished order under Supreme Court Rule 23). On June 3, 1998, the Illinois Supreme Court denied leave to appeal. *People v. Cleveland*, 178 Ill. 2d 585 (1998) (table). The following summarizes the evidence presented at the defendant's trial from our unpublished decision and the postconviction record.

¶ 4       The defendant was represented by Richard Dickinson, a private attorney. Before jury selection began, Dickinson informed the court that he would call only one defense witness: the defendant's sister, Victoria Cleveland. The court excluded Victoria from the courtroom during the trial.

¶ 5       The State's first witness was Sherrocco Allen, the only eyewitness to the shooting to testify at trial. Allen testified that on July 17, 1995, she was 15 years old. On that date, at approximately 1:30 a.m., she was at the Trumbull Park housing project sitting on the outside stairs of a building with a friend, her younger sister, and her aunt. As she sat on the stairs, Allen heard an argument "down the street" at an address "half a block" away. Her view was unobstructed and the area was well lit. Allen saw five men arguing; she identified the five as the defendant, the murder victim Magellan Steward, the attempted murder victim Martin Amos, and two others she knew only as Keith and Bowie. Allen had known the defendant for two to three years and knew him by his street name "Face" and his legal name. She had known Steward for approximately one year and knew Amos to be Steward's brother. When her attention was first drawn to the five men, she saw Amos holding a small stick.

¶ 6       Allen "wasn't really paying attention" to the men and did not hear what they were saying until she saw the defendant pull a black gun from his waist. With the gun in hand, the defendant told Amos to "put the stick away." Amos dropped the stick and the defendant returned the gun to his waist. The men continued to argue until Amos and Steward walked away toward a gangway between two buildings. As they walked away, the defendant again removed his gun and handed it to Keith. Both the defendant and Keith ran toward the gangway, where Keith shot Amos multiple times in the face and handed the gun back to the defendant. The defendant then walked forward and fired three or four shots into the gangway. Allen could not see Steward in the gangway because her view was blocked by one of the buildings. She did see that the defendant was not close enough to "put the gun on" Steward. After the shooting, the defendant, Keith, and Bowie ran away. Allen ran home.

¶ 7       Allen stated that at the time she witnessed the shootings, it was dark outside. However, the housing project buildings had working lights. Allen did not speak to the police initially because she was scared. Five days after the shooting, when she was contacted by Chicago

police detective Louis Caesar, she told the detective what she saw. She later selected the defendant from a photo array, identified him at an in-person lineup, and in court.

¶ 8    Mertis McNabb testified that she lived near the site of the shooting. On the night of the crime, she was awoken by loud arguing and later heard three or four gunshots. When she heard someone yell that people had been shot, she ran outside and observed two bodies on the ground. One body was in the front yard of a building and the other was in the gangway. She testified that there were working lights above the doorways and on top of the buildings in the area of the shooting.

¶ 9    Cook County medical examiner Joseph Kogan reviewed the Steward autopsy. Steward sustained gunshot wounds to his chest and right hand. The edges of the wound to his hand were discolored, indicating that the gun was fired from less than one inch away. The wound to the chest was not consistent with a close-range shot.

¶ 10    Chicago police officer David Pearson testified that he arrived at the scene of the shootings at approximately 1:50 a.m. Both victims were alive at the time. Only Amos could speak; he told Officer Pearson he could not identify the person that shot him. Officer Pearson testified that the buildings in the area were well lit. According to the officer, the stoop from which Allen witnessed the crime was approximately one-half block from the scene of the shootings.

¶ 11    The parties stipulated to the testimony of Dr. Richard Gonzalez, the emergency room physician where Amos was taken. Pursuant to the stipulation, Dr. Gonzalez would testify that Amos suffered a gunshot wound to the head and suffered traumatic blindness. Amos did not tell Dr. Gonzalez who shot him.

¶ 12    Detective Caesar testified that four days after the shooting, he learned an inmate in Racine, Wisconsin, had information about Steward's murder. The inmate was Sherrocco Allen's brother, Tartorious[1] Allen. He told Detective Caesar to contact his sister Sherrocco for more information. Sherrocco Allen later identified the defendant as one of the shooters to Detective Caesar.

¶ 13    The defense presented no evidence or witnesses. The defendant did not testify, and the court did not admonish him regarding his right to testify. The jury found him guilty of first degree murder and attempted first degree murder. On October 25, 1996, the court sentenced the defendant to 45 years' imprisonment for first degree murder and a concurrent sentence of 10 years for attempted murder. The defendant spoke at the sentencing hearing. He did not state that he had wanted to testify during his trial.

¶ 14    On November 24, 1998, the defendant initiated postconviction proceedings with his initial petition. In his petition, the defendant claimed his defense attorney had a conflict of interest because he had previously represented the murder victim, Steward. In his attached affidavit, the defendant averred that Dickinson did not inform him of this conflict until after his trial and sentencing. The petition also claimed his defense counsel failed to call an alibi

---

[1]The name is also spelled Tartorius in the record. We use the spelling from our unpublished decision.

-4-

witness that was ready and willing to testify on his behalf. The defendant attached an affidavit from Willanika Wheaton, in which she stated that the defendant was the father of her children. Her affidavit claimed that "on the date of the alleged crime" the defendant had been dropped off at her home by his sister, Victoria. The defendant arrived at 11:30 p.m. and remained until the next morning. To Wheaton's knowledge, the defendant did not leave her home during the night. The affidavit also stated that Wheaton had attended several pretrial hearings and had spoken to the defense attorney in anticipation of being called as a witness, but Dickinson never contacted her. Wheaton averred that had she been called, she would have testified to the facts set out in her affidavit.

¶ 15    On February 17, 1999, the court advanced the postconviction petition to the second stage and appointed the Cook County public defender's office to represent the defendant. Over the course of seven years, at least five different assistant public defenders (APD) appeared on the defendant's case. Little or no action was taken on the defendant's petition. On March 2, 2006, the defendant filed a request to have counsel appointed "other than the Office of the Cook County Public Defender." The record does not contain a ruling on this request.

¶ 16    A decade after the defendant filed his original postconviction petition, APD Pamela Leeming filed an amended petition for postconviction relief on May 29, 2009. The petition argued that Dickinson had a *per se* conflict of interest based on his prior representation of the murder victim. The amended petition also claimed that counsel was ineffective for failing to call Wheaton and Victoria Cleveland as alibi witnesses.

¶ 17    On July 15, 2009, APD Leeming filed a supplemental petition, which attached an appearance form filed by defense attorney Richard Dickinson on behalf of "Magellah Steward" in criminal case number 88168478. The supplemental petition also added that Dickinson should have called Tojuna Williams and Estrella Mares as defense witnesses, each of whom provided an affidavit that was attached to the supplemental petition.

¶ 18    According Williams' affidavit, dated June 22, 2005, she was in the Trumbull Park housing project on July 17, 1995, between 1 a.m. and 2 a.m. She averred, "[I was] with a married man whom I knew to be Fudgy. We were involved in a sexual act in the living room, when we heard ruckus." According to her affidavit, Williams looked out the window and saw Steward and Amos about eight feet away. They were "arguing with several individuals." When two of the men pulled out guns, she saw Steward run, and Williams and Fudgy "hit the deck" as they heard shots. Williams stated she knew the defendant personally and he was not one of the men that argued with Stewart and Amos. According to Williams, Fudgy told her not to speak to the police because he did not want his wife to find out she had been at his house. Williams left that night without telling the police what she saw. Months later, Williams learned that the defendant had been charged with murder and attempted murder arising from the shootings. She stated, "I contacted Mr. Cleveland's mother who directed me to Richard Dickinson. I told him that Mr. Cleveland didn't do the crime. He told me he would call me back to get my complete version of events [but] he never did."

¶ 19    The purported affidavit from Estrella Mares bore a notary seal and the signature from a notary dated September 10, 2004. The affidavit, however, was not signed by Mares. The affidavit stated that on July 17, 1995, Mares was a resident of the Trumbull Park housing

project. At 1:30 a.m., Mares was walking home when she stopped to talk to her friend, Sherrocco Allen. As they were talking, Mares heard three or four loud shots "coming from up the street" and heard someone yell, "they are shooting." Mares and Allen immediately fled for their safety. Mares never saw a gun. According to the Mares affidavit, Allen could not have seen "anything because it was dark and some distance away, and we were scared for our life. So we ran." The Mares affidavit further stated that approximately four or five months after the incident, the defendant's family contacted her to ask if she had any information. Mares told them what happened that night, and they asked her to contact Dickinson. She called Dickinson several times, but he never returned her calls. She attended court with the defendant's family and spoke directly with Dickinson, who told her to call him again because he was too busy to speak to her that day. Mares called again but Dickinson did not call her back.

¶ 20        The supplemental petition filed by APD Leeming on July 15, 2009, also added a claim that Dickinson refused to allow the defendant to testify. In support, the supplemental petition had attached an affidavit from the defendant stating that Dickinson "prevented [him] from taking the stand." According to the affidavit, when the defendant asked to testify, Dickinson stated "not right now I'm the attorney be patient." Dickinson never called the defendant to testify. The defendant averred that he did not know he could inform the court directly that he wanted to testify. Had he testified, he would have stated that he spent the night at Wheaton's house on the night of the crime, had not left, and was "miles away" when the shooting occurred.

¶ 21        On September 14, 2009, APD Leeming again supplemented the postconviction petition with a series of documents labeled "group exhibit 2." The exhibits included a copy of the information sheet for "People v. Magellah Steward" under case number 881168478 and a transcript of the preliminary hearing in the case in which Dickinson appeared on behalf of Steward. At the preliminary hearing, Dickinson cross-examined the police officer who claimed Steward possessed a controlled substance. Group exhibit 2 also included an affidavit from the defendant claiming that, sometime in 1993, Steward introduced him to a man named Roosevelt Dikes. The defendant later learned Steward and Dikes were brothers. Another document in the group was an "information indictment return sheet" indicating that Steward, Dikes, and a man named Fred Couch were indicted in case number 92 CR 12855; finally, there was an appearance form showing that Dickinson appeared on behalf of Dikes and Couch in case number 92 CR 12855.

¶ 22        On September 21, 2009, the State filed an amended motion to dismiss the postconviction petition. The State argued that Wheaton's affidavit did not provide an alibi for the defendant because Wheaton claimed the defendant was at her home from 11:30 p.m., "on the date of the alleged crime," until the next morning. According to the State, because the crime occurred at approximately 1:30 a.m. on July 17, 1995, Wheaton's statement only accounted for the defendant's whereabouts from 11:30 p.m. on July 17, which was long after the time of the shooting. The State also argued that the defendant's claim that he was denied his right to testify was untimely because he did not raise it in his original petition.

¶ 23        In his response to the State's amended motion to dismiss, the defendant attached additional exhibits to support defense counsel's prior representation of the murder victim.

It contained a series of police reports showing that "Magellah Steward," on whose behalf attorney Dickinson filed an appearance, was the same Magellan Steward that was shot and killed in the defendant's case. The response also contained affidavits from the defendant and Wheaton clarifying that the defendant arrived at Wheaton's home at 11:30 p.m. on July 16, 1995, several hours before the shooting, and remained there until the morning of July 17. The defendant submitted a second affidavit asserting that he informed each of his postconviction attorneys that his right to testify had been violated. Attached to the affidavit was a letter dated April 17, 2000, from one of those attorneys in which she acknowledged receipt of information regarding the defendant's claim of not being allowed to testify at his trial.

¶ 24   On November 9, 2009, a supervisor from the public defender's office requested leave to file an addendum to the amended petition for postconviction relief. Leeming had left the office that same month. On December 2, 2009, the assistant public defender assigned to the appear on the defendant's case was granted the earlier requested leave to file an addendum to the amended petition. The addendum elaborated on the defendant's claim that counsel was ineffective for failing to call his sister, Victoria, and added that defense counsel should also have called Dawn Temple to testify, with an affidavit from each attached.

¶ 25   Temple stated that she was at the Trumbull Park housing project on the date of the crime. She saw Steward and Amos fighting with four men, none of whom was the defendant. Temple was referred by the defendant's family to attorney Dickinson as the defendant's defense counsel. Temple stated, "I called Mr. Dickinson he told me he was busy, he took my name and number and told me he will interview me later, he never contacted me."

¶ 26   Victoria Cleveland's affidavit stated that she dropped her brother at Wheaton's home at 11 p.m. on July 16, 1995. She gave Dickinson this information and Dickinson informed her she would be called to testify. At trial, the judge excluded her from the courtroom as a potential witness, but Dickinson never called her as a witness.

¶ 27   On December 17, 2009, the court held a hearing regarding the inordinate delay in the case and the tardy submissions of the most recent affidavits. The APD informed the court that he was new to the case and did not know how the investigation had been conducted or the reason for the delay in the case. The court denied the addendum and the supplemental affidavit of Wheaton, which the defendant had filed to resolve the discrepancy regarding the date of his arrival at Wheaton's home.

¶ 28   On May 26, 2010, the court granted the State's amended motion to dismiss the defendant's pending postconviction petitions. The court reasoned that Dickinson's prior representation of Steward did not create a *per se* conflict of interest because the representation occurred seven years earlier and was limited to a preliminary hearing. The court ruled the defendant failed to establish that Dickinson "had a prior or contemporaneous professional relationship" with Steward.

¶ 29   Regarding the defendant's claims that Dickinson failed to interview the potential alibi witnesses, the court stated that he did not fail to interview Wheaton because the affidavit stated that the two actually spoke on multiple occasions; the court concluded that Dickinson did not call Wheaton as a matter of trial strategy. Moreover, Wheaton's affidavit did "not actually provide [the defendant] with an alibi" because, according to her affidavit, he "arrived

at her home at or about 11:30 p.m. 'on the date of the alleged crime [of July 17, 1995]' " with the crime having occurred around 1:30 a.m. on that date. The court rejected Estrella Mares's affidavit, aside from the absence of her signature, as attributing a "conclusion about what [Sherrocco Allen] did or did not see[, which] is nothing more than pure speculation." Williams' affidavit did not call into question the defendant's guilt because Williams never saw who fired the gun at Amos and Steward.

¶ 30    Finally, the court rejected the defendant's claim that he was deprived of his right to testify. The court questioned the timeliness of the claim, noting it was not raised in his original petition. Further, the defendant failed to explain the delay in filing the supporting affidavit, which was notarized in 2004, but not filed with the court until 2009. The court ruled that even if the claim were timely, it lacked merit because the defendant failed to inform the trial court that he wanted to testify.

¶ 31    The defendant timely filed this appeal.

¶ 32                                ANALYSIS

¶ 33    The defendant contends he made a sufficient showing of ineffective assistance of counsel as to each of his three claims. First, he asserts his defense attorney acted under a *per se* conflict of interest because Dickinson represented the murder victim even though that representation occurred seven years earlier and, it appears, was limited to pretrial matters. Second, the defendant argues he made a substantial showing of defense counsel's ineffectiveness by his failure to call "five witnesses who made themselves known to counsel" and would have provided alibi testimony. Lastly, the defendant argues he made a substantial showing that trial counsel prevented him from testifying, which also renders his assistance ineffective.

¶ 34                            Conflict of Interest

¶ 35    The defendant contends he has demonstrated a *per se* conflict by his defense counsel, which automatically mandates a new trial. He asserts that when a *per se* conflict of interest exists, a defendant is not required to show prejudice under Illinois case law as the supreme court ruled in *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008). The State responds that a *per se* conflict of interest has not been shown because Dickinson's representation of the victim was limited in extent and duration and had terminated years before his representation of the defendant began. The State further argues that the United States Supreme Court case of *Mickens v. Taylor*, 535 U.S. 162 (2002), mandates that the defendant show actual prejudice even if he can demonstrate a *per se* conflict under Illinois case law. The State argues the federal rule from *Mickens* trumps the Illinois rule. According to the State, the federal rule is the better reasoned rule because it negates any incentive defense counsel may have to withhold information as to a *per se* conflict until after conviction, which under the Illinois *per se* conflict rule automatically grants a defendant a new trial.

¶ 36    We are unconvinced by either the defendant's claim that a *per se* conflict has been shown on the record before us as a matter of law or by the State's contention that prejudice must first be shown before a substantial showing can be made to permit the defendant's

postconviction claim to go forward.

¶ 37    Under the Post-Conviction Hearing Act (the Act), a defendant bears the burden of demonstrating that he qualifies for relief under the Act. 725 ILCS 5/122-1(a)(1) (West 2008). To merit relief, a defendant must demonstrate that his conviction was the result of a violation of a constitutional right. *Hernandez*, 231 Ill. 2d at 142. If relief is warranted under the Act, it generally follows a third-stage evidentiary hearing, where the defendant must prove a constitutional violation and the State is permitted to challenge the defendant's evidence and present its own evidence. A third-stage evidentiary hearing will ensue only upon a substantial showing by the defendant at the second stage that his constitutional rights were violated during his trial. *People v. Caballero*, 126 Ill. 2d 248, 258-59 (1989). We review the circuit court's decision to dismiss a petition at the second stage *de novo*. *People v. Childress*, 191 Ill. 2d 168, 174 (2000).

¶ 38    Every defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Constitution of Illinois. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Effective assistance inherently includes assistance by an attorney whose allegiance to his client is not burdened by conflicting interests or inconsistent obligations. *Hernandez*, 231 Ill. 2d at 142-43. Some conflicts of interest are "*per se* conflicts" because they fundamentally interfere with effective representation. *Id.* at 142-43. There are three types of *per se* conflicts: (1) "when defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution"; (2) when defense counsel represents the defendant and a prosecution witness simultaneously; and (3) when defense counsel was formerly a prosecutor and was involved in the defendant's case. *Id.* at 143. When a *per se* conflict exists, a defendant need not show actual prejudice because the manner in which prejudice arises from conflicting obligations is " 'difficult to detect and demonstrate.' " *Id.* (quoting *People v. Spreitzer*, 123 Ill. 2d 1, 16 (1988)). For this reason, "[u]nless a defendant waives his right to conflict-free counsel, a *per se* conflict is grounds for automatic reversal." *Id.* (citing *People v. Morales*, 209 Ill. 2d 340, 345 (2004)).

¶ 39    In *Hernandez*, the defendant was recorded hiring a police informant to kill a man named Jaime Cepeda. *Id.* at 138. After the defendant was tried and convicted in 2003, he learned that his defense attorney had in 1999 been hired to represent the victim, Cepeda, in connection with an unlawful use of a weapon charge for which Cepeda failed to appear for trial in 2001. A bond forfeiture warrant was issued for Cepeda, with the case still unresolved in 2003. *Id.* at 139. Hernandez's defense attorney had no contact with Cepeda after Cepeda allegedly fled the country. *Id.*

¶ 40    Hernandez filed a postconviction petition, claiming ineffective assistance of counsel. The petition proceeded to a third-stage evidentiary hearing, at which the defense attorney testified he still considered Cepeda to be his client. He remained the attorney of record for Cepeda and would be obligated to appear in court if Cepeda were ever arrested on the bond forfeiture warrant. *Id.* at 139-40. The circuit court concluded Hernandez's conviction did not involve a *per se* conflict of interest; this court affirmed; the supreme court reversed.

¶ 41    The supreme court held that the attorney's representation of both the defendant and his

victim created a *per se* conflict. *Id.* at 152. It was of no consequence that the attorney had not spoken to Cepeda in several years because representation need not be "active" or "contemporaneous" to give rise to a *per se* conflict. *Id.* at 151. The court decreed that any dual representation that is not disclosed creates a conflict "regardless of whether the attorney's relationship with the alleged victim is active or not, and without inquiring into the specific facts concerning the nature and extent of counsel's representation of the victim." *Id.* at 151-52.

¶ 42    *Hernandez* supports the defendant's contention that he has made a substantial showing that his defense attorney suffered under a conflict of interest by his prior representation of the murder victim. Defense counsel should have disclosed that representation to the defendant before representing the defendant on the charge of murdering defense counsel's prior client. Also, counsel's prior representation of the murder victim raises the specter that something other than trial tactics were involved in the decision not to call the numerous witnesses the defendant contends were made known to counsel in the course of preparing for trial. Though the conflict should have been disclosed, it is not certain that defense counsel's long-ended representation of the murder victim has established a *per se* conflict of interest. *Cf. Hernandez*, 231 Ill. 2d at 141 (circuit court denied postconviction relief where defense attorney had no substantial contact with Cepeda for five years "and Cepeda had not been called as a witness at defendant's trial").

¶ 43    Whether the representation by defense counsel many years earlier of the murder victim gives rise to a *per se* conflict will depend on the facts adduced during the course of the evidentiary hearing. See *People v. Gacho*, 2012 IL App (1st) 091675, ¶ 32 (a third-stage evidentiary hearing is warranted because "the evidence adduced at any such hearing may affect the strength of the defendant's allegations [of defense attorney's conflict of interests] in unforeseeable ways"). As made clear by the opinion of our supreme court in *Hernandez*, in which it referenced much of the testimony of defense counsel adduced during the third-stage hearing, the defendant must prove his claim of *per se* conflict before relief can be granted under the Act. We also note that the postconviction petition in *Hernandez* was supported by the affidavit of the defense attorney; no such affidavit has been filed to support the defendant's contention that proceedings short of what occurred in *Hernandez* are warranted here. See *Hernandez*, 231 Ill. 2d at 142 (a *per se* conflict may turn on whether the person with conflicting loyalties "would benefit from an unfavorable verdict for the defendant"). An evidentiary hearing is necessary to determine whether attorney Dickinson was "in a duplicitous position where his full talents–as a vigorous advocate having the single aim of acquittal by all means fair and honorable–are hobbled or fettered or restrained by commitments to others' [citation], [to permit a court to conclude that] effective assistance of counsel is lacking." (Internal quotation marks omitted.) *Id.*

¶ 44    The State, nevertheless, points to two distinctions between this case and *Hernandez*, which it contends precludes an evidentiary hearing on the *per se* conflict claim. In this case, Dickinson represented the victim only at a preliminary hearing and that representation terminated a full seven years prior to the defendant's trial. We disagree that either renders the showing made by the defendant here not substantial as to his contention that effective assistance by attorney Dickinson was lacking based on his prior representation of the murder

victim.

¶ 45    The remoteness of the attorney-client relationship between defense counsel and the murder victim does not preclude a finding of a *per se* conflict. The *Hernandez* court specifically noted that a prior relationship by defense counsel with the victim of the defendant's charged offense may trigger the *per se* conflict rule. "We decline to impose an 'active' requirement upon this category of *per se* conflicts ***." *Id.* at 151. "[A] prior relationship falls within this category." *Id.* It falls to the finder of fact to determine whether the prior relationships gave rise to a *per se* conflict. Findings of fact at an evidentiary hearing are necessary to "resolve the question[ ] of whether counsel suffered from a *per se* conflict." *Gacho*, 2012 IL App (1st) 091675, ¶ 32.

¶ 46    Nor does defense counsel's representation of the victim in limited proceedings many years ago necessarily preclude a finding of a *per se* conflict. The supreme court stated that the applicability of the *per se* rule does not turn on the "nature and extent" of counsel's prior representation. *Hernandez*, 231 Ill. 2d at 151-52.

¶ 47    In a last-ditch effort, the State argues that the *Hernandez* rule does not apply because it has been superceded by the United States Supreme Court case of *Mickens v. Taylor*, 535 U.S. 162. In *Mickens*, the same attorney was appointed to represent the defendant against a state murder charge who had also represented the victim of the murder on unrelated charges. *Id.* at 164-65. The same juvenile judge that dismissed the pending charges against the deceased juvenile also appointed defense counsel to represent the defendant on the murder charge. *Id.* at 165. Defense counsel did not disclose his previous representation of the victim to either the court or the defendant. In federal *habeas* proceedings, the defendant challenged his conviction as a result of ineffective assistance of counsel. The defendant stressed that the juvenile judge had failed to inquire into the conflict, despite, as he argued, having an obligation to do so. After an evidentiary hearing, the federal district court denied *habeas* relief, which was affirmed on appeal. The Supreme Court held that to warrant reversal of the conviction, the defendant had to show that the conflict adversely affected his attorney's performance. *Id.* In other words, even upon a showing of a conflict of interest, a defendant must demonstrate actual prejudice.

¶ 48    The State asks us to hold that a conflict of authority exists between *Hernandez* and *Mickens* and that *Mickens* controls. We note this argument was raised and rejected recently. See *People v. Fountain*, 2012 IL App (3d) 090558. In any event, our supreme court addressed the question of whether *Mickens* compelled a different result in *Hernandez* and determined that it did not. "[O]ur *per se* rule does not conflict with *Mickens*." *Hernandez*, 231 Ill. 2d at 146. The court gave three reasons *Mickens* did not control. *Id.* at 145-46. First, *Mickens* involved the failure of the trial court to inquire into a potential conflict, not a claim that the defendant was unaware of the conflict. *Id.* at 145. "The question before the Court was not whether a conflict existed, be it an actual conflict or otherwise." *Id.* Second, the facts of *Mickens* distinguish it from *Hernandez*. *Id.* In *Mickens*, the attorney believed he had no continuing duty to the deceased victim, while in *Hernandez*, representation was ongoing. *Id.* at 145-46. Finally, "and most importantly," the Illinois *per se* conflict rule fell within one of the exceptions enumerated by the Supreme Court in *Mickens*. *Id.* at 146. *Mickens* discussed the " 'high probability of prejudice arising from multiple concurrent representation, and the

-11-

difficulty of proving that prejudice.' " *Id.* (quoting *Mickens*, 535 U.S. at 175). In such a case, "the verdict is so likely unreliable that a case-by-case determination is unnecessary." *Id.*

¶ 49　　We follow the Third District majority in rejecting the State's contention that a conflict exists between the federal rule and the Illinois *per se* rule. *People v. Fountain*, 2012 IL App (3d) 090558. The *Fountain* court ruled it was bound by the Illinois Supreme Court's express rejection of the State's argument that the *per se* rule conflicts with *Mickens*. *Id.* ¶ 23. The *Fountain* court recognized that "as an intermediate court of review, we may not overrule our supreme court's interpretation of a United States Supreme Court decision unless it has been overturned by the United States Supreme Court or abandoned by our supreme court." *Id.* ¶ 23 n.5. We are obligated to take the same approach. "[U]nless and until our supreme court or the United States Supreme Court overturns *Hernandez*, we are bound to follow it." *Id.*

¶ 50　　To be clear, we acknowledge that the second reason offered by the *Hernandez* court for not following *Mickens*–that the prior representation of the victim by defense counsel in *Mickens* had terminated while the *Hernandez* attorney's representation was ongoing–has no application here. However, the other two bases on which the supreme court differentiated our *per se* rule from *Mickens* have clear application here. Even more importantly, after the supreme court made the factual distinction with *Mickens*, it went on to reiterate the rule that both prior and contemporaneous representation, regardless of extent, may serve as the basis for a *per se* conflict. *Hernandez*, 231 Ill. 2d at 151-52. That is the rule we are bound to follow in this case.

¶ 51　　Finally, we address the State's assertion that the *per se* rule gives defense attorneys a "golden ticket" to withhold information about a conflict of interest until after trial, thereby granting their clients an automatic new trial should conviction ensue. Our supreme court addressed this concern and concluded, " '[it] is a risk that this court is prepared to take' " to ensure adequate representation for defendants. *Id.* at 147 (quoting *People v. Coslet*, 67 Ill. 2d 127, 136 (1977)). In the instant case, the State claims that "defense counsel kept [his] prior representation a secret" and then the defendant sought "to use that deception as his ticket to a new trial." We note, however, that the question of any deception by defense counsel has yet to be resolved. Even still, as the *Hernandez* court effectively ruled, it is inappropriate to punish the defendant for bad behavior on counsel's part.

¶ 52　　Typically, the remedy for improper dismissal at second-stage postconviction proceedings is a remand to the circuit court for an evidentiary hearing. The defendant requests, instead, that we reverse his conviction and remand for a new trial based on the *per se* conflict. While it is true that authority exists that permits a court to forego an evidentiary hearing, the narrow circumstances under which that may occur are not present in this case. See *People v. Jimerson*, 166 Ill. 2d 211, 231 (1995) (to grant postconviction relief without an evidentiary hearing, the facts must not be in dispute and the hearing must serve no purpose). This case does not permit a finding of a *per se* conflict of interest as a matter of law based on the record before us. We note one of possibly many factual disputes: the State does not accept that the "Magellah Steward" Dickinson represented at the preliminary hearing is the same "Magellan Steward" the defendant was accused of murdering, as the defendant's exhibits appear to establish.

¶ 53    Furthermore, leaving aside the discrepancy in the name, it is proper for the circuit court to hold an evidentiary hearing to establish a factual record for further review by a higher court. While the question of whether a *per se* conflict exists is a legal one (*People v. Fields*, 2012 IL 112438, ¶ 19), it is the facts of the case that drive the legal question. This court is not the proper forum for finding facts upon which a legal question will turn. After an evidentiary hearing, a reviewing court will have at its disposal a fully established factual record and will be in a position to fully assess the circuit court's decision on the issue. At this stage of the proceedings, we only conclude that the petitioner has made a substantial showing that his constitutional right to undivided representation of counsel was lacking; thus, he is entitled to an evidentiary hearing on his claim that his attorney suffered from a *per se* conflict of interest in representing him when he had previously represented the murder victim. "In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in any accompanying affidavits are taken as true." *People v. Towns*, 182 Ill. 2d 491, 503 (1998).

¶ 54                              Exculpatory Witnesses

¶ 55    That the defendant is entitled to an evidentiary hearing on his claim of ineffective assistance of counsel based on his claim of a *per se* conflict does not mean he is entitled to a hearing on his two remaining claims of his counsel's ineffectiveness. Only those claims in which a substantial showing has been made entitle the defendant to an evidentiary hearing. See *People v. Lara*, 317 Ill. App. 3d 905, 908 (2000) (certain claims properly dismissed at second stage while remaining claim proceeded to third-stage evidentiary hearing).

¶ 56    Before we reach the defendant's contention that he made a substantial showing regarding his claim that defense counsel was ineffective for failing to call the numerous witness that have provided postconviction affidavits, we first address the defendant's challenge to the trial court's decision to strike certain affidavits as untimely. The defendant urges that the trial court erred in striking the affidavits of three witnesses, as well as Williams' clarifying affidavit as to when the defendant arrived at her home. Each of the affidavits was filed by appointed counsel after the original petition was amended and before the circuit court took under consideration the State's amended motion to dismiss the petition. The State makes a three-fold response to the supplemental affidavits: the affidavits were properly stricken as untimely; the decision not to call the witnesses was a matter of trial strategy; and counsel's actions in not calling the witnesses did not prejudice the defendant.

¶ 57    The Act provides for postconviction relief when a conviction arises from a substantial violation of a constitutional right. 725 ILCS 5/122-1(a)(1) (West 2008). The postconviction process consists of three stages. *People v. Brown*, 336 Ill. App. 3d 711, 716 (2002). When the trial court fails to address a petition within 90 days of its filing, the petition must be placed on the court's docket for second-stage proceedings. 725 ILCS 5/122-2.1(b) (West 2008). The Act provides that only one petition alleging deprivation of constitutional rights may be filed without the court's permission. 725 ILCS 5/122-1(f) (West 2008). However, there is a distinction between an amended petition and a second postconviction petition. See 725 ILCS 5/122-3 (West 2008) (claims "not raised in the original or an amended petition"

are waived). Because the burden increases substantially before permission may be granted to file a second petition, the Act provides for liberal amendments to an original petition. 725 ILCS 5/122-5 (West 2008). The circuit court has discretion to allow an "amendment of the petition *** as shall be appropriate, just and reasonable and as is generally provided in civil cases." *Id.* "Generally, when a party asks to amend a complaint, leave to do so is freely given." *Brown*, 336 Ill. App. 3d at 716.

¶ 58    The State provides us with no authority for its contention that the circuit court properly struck the affidavits the court ruled were untimely. Nor has the State directed our attention to any provision of the Act that expressly directs supporting affidavits, as opposed to pleadings, must be filed with permission of the court. *Cf.* 725 ILCS 5/122-5 (West 2008) ("The court may in its discretion make such order as to amendment of the petition or any other pleading, or as to pleading over, or filing further pleadings, or extending the time of filing any pleading other than the original petition, as shall be appropriate, just and reasonable and as is generally provided in civil cases."). We are unpersuaded that the circuit court acted properly in striking the "untimely" affidavits. It is consistent with Illinois Supreme Court Rule 651(c) (eff. Dec. 1, 1984) to permit appointed counsel to supplement support for the defendant's constitutional claims with such evidence as can be gathered before the circuit court rules on the State's motion to dismiss. See *People v. Johnson*, 154 Ill. 2d 227, 237-38 (1993) (appointed postconviction counsel has the duty to make any amendments to the *pro se* petition necessary to adequately present the defendant's constitutional contentions).

¶ 59    Here, the State filed its amended motion to dismiss on September 21, 2009, which the circuit court granted on May 26, 2010. As best we can tell, the court granted appointed counsel leave to file supplemental support for the petition on December 2, 2009. The hearing held on December 19, 2009, to delve into the inordinate delay in addressing the petition revealed nothing that might suggest dilatory conduct on the defendant's part. The defendant's petition simply did not receive the attention of the public defender's office to resolve the claims any sooner. The stricken affidavits did not add claims or arguments the way an amended pleading would. They simply added factual support to the claims already before the court. We see no reason to strike the affidavits as untimely. On *de novo* review before the reviewing court, each is entitled to be fully considered as to the defendant's claim that counsel was ineffective for failing to call potential exculpatory witnesses. *Cf. People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 71 (affidavits may serve different purposes at first and second stage proceedings).

¶ 60    Turning to the merits of the claim that defense counsel was ineffective for failing to interview potential alibi witnesses, it is difficult to see how refusing to call several witnesses who could have provided an alibi for the defendant constituted reasonable trial strategy. See *People v. King*, 316 Ill. App. 3d 901, 916 (2000) (failure to call alibi witness constituted deficient representation where no explanation was offered to support characterization of counsel's inaction as trial strategy). Although we give counsel deference to make strategic decisions at trial, the record is barren of any reasonable strategy that may have been employed by counsel in calling no witnesses and presenting no evidence. At the every least, counsel's decision to call no witnesses when several exculpatory witnesses presented

-14-

themselves, according to the affidavits, constitutes a substantial showing that his representation was objectively unreasonable. *Id.* In the absence of a showing of reasonable trial strategy, a sufficient showing has been made that counsel's decision prejudiced the defendant. See *People v. Bryant*, 391 Ill. App. 3d 228, 241-42 (2009) (failure to call witnesses prejudiced defendant and thus constituted ineffective assistance of counsel). It seems clear that putting on alibi evidence before the jury would have increased the defendant's chances of acquittal.

¶ 61    The defendant has made a substantial showing that his constitutional right was violated by defense counsel's failure to investigate fully the possible testimony of exculpatory witnesses to entitle him to an evidentiary hearing. Whether the witnesses are truly exculpatory and their absence at trial prejudicial, it is the defendant's burden to prove at a third-stage evidentiary hearing before a circuit court judge as trier of fact. We note that the defendant's answer to discovery spread of record does not assert an alibi defense. See *People v. Lara*, 317 Ill. App. 3d 905, 908 (2000) (the circuit court properly denied the defendant postconviction relief after an evidentiary hearing on the claim of ineffective assistance of counsel where the defendant did not prove that trial counsel's deficient representation prejudiced the defendant).

¶ 62                                     Right to Testify

¶ 63    The defendant's last argument is that trial counsel was ineffective in preventing him from testifying in his own defense. The State counters that the defendant forfeited this argument because he did not raise it in his original petition and the claim does not relate back to those raised in the original petition. The State further argues that the claim lacks merit because the defendant did not inform the trial court of his desire to testify.

¶ 64    We reject the State's contention that the defendant was bound to proceed with only those claims raised in his original petition. Our supreme court has made clear, that while appointed counsel is under no obligation to add new claims to a *pro se* petition in carrying out his duty to provide reasonable assistance under Illinois Supreme Court Rule 651(c) (eff. Dec. 1, 1984), he is free to do so. See *People v. Pendleton*, 223 Ill. 2d 458, 476 (2006) (appointed postconviction counsel may raise other issues than those raised in the *pro se* petition, though counsel is under no duty to do so). Nevertheless, we agree with the State that the defendant has not made a substantial showing that he was prevented from testifying by his defense attorney.

¶ 65    A defendant has a constitutional right to testify and only he can waive this right. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). As with many constitutional rights that may waived, it is incumbent upon the defendant to assert his right to testify such that his right can be vindicated during the course of the trial. *People v. Thompkins*, 161 Ill. 2d 148, 178 (1994); *People v. Knox*, 58 Ill. App. 3d 761, 767 (1978) (a defendant must make known to the court his objection to defense counsel's decision to rest without presenting the defendant's testimony).

¶ 66    At this stage of the proceedings, we take all the defendant's factual assertions as true. The defendant claims that after his attorney announced that the defense rested its case, he

informed the attorney that he wished to testify. To this, counsel responded, "not right now, I'm the attorney be patient." At no point did the defendant inform the court that he wished to testify or that counsel refused to permit him to do so. The defendant claims he did not inform the court of his decision because he was not aware he could address the court. The defendant claims that he waited patiently to be called to the stand; however, the defendant also claims that this conversation took place after counsel announced the defense was resting its case. It was incumbent upon the defendant to raise his desire to testify, at the very least, before closing arguments were heard by the jury. See *Thompkins*, 161 Ill. 2d at 178; *Knox*, 58 Ill. App. 3d at 767. Because the defendant's silence can be taken as acquiescence in defense counsel's decision to rest without calling the defendant as a witness, neither the record nor his affidavit provides substantial support for his claim that he was thwarted from testifying.

¶ 67        While the defendant claims he was unaware that he could address the court at the time of trial to announce his desire to testify, we note that the defendant addressed the court at sentencing. He spoke after counsel had argued for a new trial based on alleged trial errors. At no point did the defendant state or even intimate that he was precluded from testifying before the jury. Illinois courts have voiced concern over the ease with which this ineffectiveness of counsel claim can be made. See, *e.g.*, *People v. Brown*, 54 Ill. 2d 21, 24 (1973) (a defendant "will stand to gain if he can succeed in establishing that he did not testify because his lawyer refused to permit him to do so"). More than the defendant's self-serving statement is required to demonstrate that he truly desired to testify, which defense counsel failed to observe. *Thompkins*, 161 Ill. 2d at 177 (claim rejected where "the defendant was silent when counsel rested the case without having called the defendant to the stand"). Although the modern practice of inquiring of the defendant, outside the presence of the jury, as to whether he or she wishes to testify, was not followed here, it is incumbent upon the defendant to invoke his own right to testify. *Knox*, 58 Ill. App. 3d at 767 (where no contemporaneous claim is made during the course of his trial that the defendant desires to testify, his belated claim is nothing more than an afterthought). Because the defendant took no steps to invoke his right to testify during his trial, his claim fails to warrant consideration at a third-stage evidentiary hearing.

¶ 68                                  CONCLUSION

¶ 69        The defendant has made a substantial showing that his trial attorney was subject to a *per se* conflict where his trial attorney had previously represented the murder victim and did not disclose this conflict to the defendant. The trial court erred in dismissing the defendant's claim for ineffective assistance based on counsel's failure to call several exculpatory witnesses. These witnesses were the only evidence available to rebut the State's case and defense counsel's unexplained failure to call the witnesses made a substantial showing of deficient performance and prejudice. We reverse the dismissal of the first two claims of ineffective assistance of counsel and remand for a third-stage evidentiary hearing on the *per se* conflict claim and the claim that defense counsel unreasonably failed to call numerous alibi witnesses. The trial court did not err in dismissing the defendant's claim that his defense counsel prevented him from testifying where the defendant voiced no objection to counsel's

decision to rest without the defendant's testimony.

¶ 70       Reversed and remanded with directions.